## BIG DIAMOND MILLS COMPANY v. CHICAGO GREAT WESTERN RAILROAD COMPANY.[1]

November 15, 1929.

No. 27,514.

*Junell, Dorsey, Oakley & Driscoll* and *Leland Scott,* for appellant.
*Harold G. Simpson,* for respondent.

OLSEN, C.

Appeal by defendant from a judgment in district court.

Plaintiff sues to recover freight overcharges on shipments of wheat milled in transit. Carloads of wheat originating in the country beyond Minneapolis were accepted for shipment by defendant from Minneapolis to East Joliet, Illinois, with milling in transit privilege at points on defendant's railway in Minnesota. The ultimate destinations of the product were points east of the Indiana-Illinois line. The wheat was milled at Morristown, Minnesota, and the flour product shipped from there to East Joliet. The shipments

[1]Reported in 227 N. W. 430.

were transported under the defendant's regular published tariff. The tariff rate on wheat from Minneapolis to East Joliet was 11 cents per hundred weight, and on flour 15 cents per hundred weight. The defendant charged and collected the 15-cent flour rate from Minneapolis to East Joliet on these shipments. Plaintiff claims that under the published tariff and milling in transit privilege therein included it was entitled to have these shipments transported at the wheat rate of 11 cents. The trial court sustained plaintiff's claim and awarded recovery for an overcharge of 4 cents per hundred weight.

■ The question presented is whether the published tariff of defendant then in force, with the milling in transit privilege therein provided, fixes the tariff rate at the wheat rate or the flour rate. The identical question here involved was presented in the case of Sheffield King Milling Co. against this defendant, reported in 168 Minn. 402, 210 N. W. 282. In that case the published tariff schedules were not properly included in the settled case and record before this court, except to the extent that witnesses quoted from them or testified as to their contents. The court did however on the evidence in the record in that case say [168 Minn. 404]:

"There is really no question of the existence and nature of the milling in transit privilege. It was a right to move the wheat from Minneapolis to Faribault at the local rate, and move the product to East Joliet, and for all services pay the wheat rate from Minneapolis to East Joliet. * * * The defendant's one witness, its head rate clerk of overcharge claims, substantially concedes this, but claims that Item 215 of printed Tariff 28-E, not before us, relating to transit privileges, has the effect, because of a clause providing for 'rate on grain products to destination,' of making the products rate, 15 cents, instead of the wheat rate, 11 cents, applicable. If these tariffs were before us our task would be easier. So far as we can see the 11 cent rate was the effective one; certainly the finding to that effect is sustained. It would be difficult to hold that a published rate, explicit in terms, was overcome by the language of Item 215, so uncertain in its application."

Without conceding that, because the record therein presented was defective, the former decision does not determine the exact question now presented, we may examine the present record. If satisfied that upon the present record the former decision was erroneous, we are not bound thereby in any event. The published tariff rate is the legal rate, and the inquiry is: What was the published rate? Only the rates between Minneapolis and East Joliet are in dispute, although the commodity moved from beyond Minneapolis to points beyond East Joliet.

The parts of defendant's published tariff claimed applicable to the case are printed in the record. Exhibit C-2 fixes the rate on grain from Minneapolis to East Joliet at 11 cents per hundred weight and on flour at 15 cents. Exhibit C-3, Item 5, attempts to define transit privileges as follows:

"Transit privilege shall be understood to mean the shipping of Grain, and other designated commodities, or products, to stations where Elevators, Warehouses, Mills, Cleaning Houses, Malt Houses or Manufactories are located, and of shipping therefrom certain designated commodities, or products, at the difference between the rate paid to the transit station and the through transit rate from point of origin, as shown by surrendered freight bills or credit tonnage slips, to transit destination."

Flour is designated as a product from wheat, to which the privilege applies. Morristown was the transit station and East Joliet the transit destination. This definition, standing alone, does not indicate that there would be any change of rate because of the change of the commodity from wheat into flour. The rate paid from the point of origin to the transit station would concededly be the wheat rate. The through rate from point of origin would mean the same thing, unless other provisions of the tariff provide differently. Item 20 of the same exhibit provides:

"A. Rate into the transit station will be the current tariff rate point of origin to such station.

"B. Rate from the transit station to transit destination will be the difference between the rate collected to the transit station and

the rate point of origin to transit destination, authorized on pages 10 to 23, inclusive, in force on date of shipment from point of origin, as shown on freight bill surrendered, plus additional charge, if any, for additional service or out-of-line haul, as authorized in published tariffs which are lawfully on file with the Interstate Commerce Commission."

The term "rate" in these rules is apparently used to mean either rate or freight charge, as the context may require. It cannot mean that the commodity should be transported from the transit station for the difference between two rates.

Item 125 of the same exhibit provides:

"Transit privileges authorized herein to Chicago, Ill., will also apply to the following stations when destined to points east of the Indiana-Illinois State line, as described in Circular 1-0, Agent E. B. Boyd's I. C. C. A-1091, supplements thereto and reissues thereof."

East Joliet, Illinois, is named as one of these stations.

Item 215 of this same exhibit is divided into three separate sections or brackets. All of them refer to grain originating beyond but shipped from Minneapolis and St. Paul, but differ as to destination and transit station. The first section applies to grain going to Chicago and intermediate stations and milled in transit at any intermediate station on defendant's railway. By reference to numbered indices, Morristown is designated as one of these stations. The last column in the section is headed: "Rate (See Item 20)" thus referring back to Item 20 heretofore quoted. Under this heading, in the first section, appear the words "Rate to destination."

The court properly considered together the sections or items we have referred to, and held that Items 5 and 20 meant that the through rate to be applied, and from which the freight charge into the transit station was to be deducted, was the through rate on grain. It held that Item 215, first section, taken in connection with Item 125, naming East Joliet as a station to which the transit privilege to Chicago applied, was applicable to these shipments and fixed

the rate to transit destination on the commodity as the grain instead of the flour rate.

The appellant contends that the third section or bracket of Item 215 applies. The second section or bracket, naming Chicago as the transit point, concededly has no application. The third section has reference to grain moving from Minneapolis and St. Paul to points east of the Indiana-Illinois state line and milled in transit at intermediate stations on defendant's railway. By reference to indices, Morristown is included among such stations. In the column headed "Rate" are the words: "Rate on Grain Products to destination. (Applies only on Grain milled in transit.)"

As stated in the Sheffield King Milling Co. case, 168 Minn. 402, 405, 210 N. W. 282:

"It would be difficult to hold that a published rate, explicit in terms, was overcome by the language of Item 215, so uncertain in its application."

The decisions quoted from in appellant's brief are not very decisive of the issue here presented. Central R. Co. v. U. S. 257 U. S. 247, 42 S. Ct. 80, 66 L. ed. 217, was an action to compel certain railroads to grant a privilege, similar to milling in transit, on timber creosoted in transit. What the rate should be was not in issue. Central Yellow Pine Assn. v. Vicksburg, S. & P. R. Co. 10 I. C. C. 193, was a case involving the right of certain railways to divide transportation charges with certain tap lines bringing logs to the sawmills. In Mixed Car Dealers Assn. v. D. L. & W. R. Co. 33 I. C. C. 133, 139, the question was whether it was lawful for certain railroads to apply the through rate on grain products from point of origin to ultimate destination on grain milled in transit. The court held that it was not unlawful if the rate was properly published in the tariffs and did not result in unreasonable charges. In the present case the issue is: What was the published tariff rate?

We conclude that the court properly found that the published tariff rate here was the grain rate.

■ Respondent is allowed $200 as counsel fees in this court, to be allowed and taxed as costs herein.

Judgment affirmed.