**MUELLER–HUBER GRAIN CO. et al. v. TEXAS & N. O. R. CO.**

No. 2672.

Court of Civil Appeals of Texas. Waco.

March 28, 1946.

R. G. Harris and J. B. Lewright, both of San Antonio, for appellants.

Moursund, Ball, Moursund & Bergstrom, of San Antonio, for appellee.

LESTER, Chief Justice.

Appellee recovered judgment against Mueller-Huber Grain Company, hereinafter called the Grain Company, for the sum of $1474.15, representing an undercharge in freight rates, and against United States Fidelity & Guaranty Company of Maryland for the sum of $1000, representing the amount of its bond which it had executed guaranteeing the payment of freight charges.

Appellee's claim involved fourteen carload shipments of barley malt originating in Wisconsin and Minnesota and consigned to the San Antonio Brewing Association, hereinafter called the Brewing Association. The Brewing Association received said malt and used it in manufacturing beer and the brewer's grain (a bi-product of the barley malt) was sold to the Grain Company and said Grain Company in turn shipped said brewer's grain to Houston, Texas, at a through rate from point of origin.

The Grain Company's contention is that it had a right to ship the brewer's grain at the through rate as it had qualified and was at that time entitled to transit privilege. Appellee contends that the consignee, the Brewing Association, did not have transit privilege and that the local rate and not the through rate applied. The parties stipulated that if the transit or through rates were applicable the freights paid were correct; if not applicable, the local rate undercharges claimed by appellee would be recoverable. The disposition of this appeal depends upon the proper construction of the tariff governing the shipments in question.

■ "Transit privilege" is a privilege accorded to certain shippers who comply with the provisions of the tariff relative to the commodities for which the so-called transit privilege is accorded. The principle behind a transit privilege is that a particular commodity is shipped by the carrier to a particular station which has been designated in the tariff as a transit station, at which place the commodity is milled or processed and the resultant manufactured product is then forwarded by the carrier to its ultimate destination, and a through rate is applied to the entire movement from the point of origin of the shipment to its final destination as though said movement had been continuous. In an operation of this kind it is considered that the entire movement from point of origin to final destination is a movement of the identical product but that the product may be altered in the course of the movement by milling or manufacturing. A common and easily understood illustration of a movement of this kind is where ear corn is shipped from the point of origin to a transit station, where it is delivered to a transit operator who engaged in the operation of a shelling plant, at which plant the corn is shelled and cleaned and the resultant shelled corn is forwarded to its ultimate destination, it being consid-

ered that the shelled corn that arrived at the ultimate destination was in reality the same corn in ear form that originated at the point of origin and therefore would take a through rate from the point of origin to the final destination instead of a combination of local rates from the point of origin to the transit station and from the transit station to its final destination.

■ The Grain Company contends "that properly construed, the tariffs accorded 'transit privileges' in the product brewer's grain transferred by the Brewing Association to admitted 'transit operator' the Grain Company, who shipped from transit station the fourteen carload shipments involved to Houston, Texas; and the transit or through rate accorded said fourteen shipments was properly accorded." This position would be correct if the Grain Company had been the consignee in the various shipments in question because it was entitled to transit privileges, or if the Brewing Association had qualified as a transit operator prior to the shipments in question, but it had not. The Brewing Association had never notified the carrier's agent in writing of its intention to open a transit account, nor did it keep complete and accurate records of transit and non transit tonnage received and forwarded, as provided in Item 25 of the tariff. "Transit operator" is defined to mean a party operating a transit house or space therein and making use of the transit privilege thereat. Item 15 of the tariff was not complied with in that the inbound shipments of the barley malt were not unloaded by the consignee into a transit house at the station, for the Brewing Company did not maintain a transit house nor was it entitled to transit privileges. The way-bills and the station freight bills for such shipments did not show by notation by the carrier's agent into what transit house the shipments were unloaded. Section (a) of Item 30 concerning recording of inbound freight bills provides that: "As evidence of intention to make use of transit privilege, inbound, paid freight bills covering tonnage received at the transit station must be presented to the Western Weighing and Inspection Bureau or other authorized agency of the carrier for recording within thirty days from date of inbound freight bill issued at transit station."

■ It has been held that tariff relating to transit privilege is an entirety and must be accepted and carried out in its entirety or not at all. Carson Lumber Co. v. St. Louis & S. F. R. Co., 10 Cir., 209 F. 191; Vol.

10, C.J., pp. 498, 499, 13 C.J.S., Carriers, § 381. We believe that a substantial compliance with the foregoing provisions of the tariff is required. None of the same being complied with by the Brewing Association, such failure to do so on its part prevents appellant Grain Company from being entitled to the transit and through rate privilege.

The judgment of the trial court is therefore affirmed.