[Civ. No. 28071. Second Dist., Div. One. Aug. 10, 1964.]

SOUTHERN PACIFIC COMPANY, Plaintiff and Respondent, v. UNITED STATES STEEL CORPORATION, CONSOLIDATED WESTERN STEEL DIVISION, Defendant and Appellant.

Musick, Peeler & Garrett and Bruce A. Bevan, Jr., for Defendant and Appellant.

E. D. Yeomans and Walt A. Steiger for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment for plaintiff rendered in an action to collect freight undercharges.

In a complaint filed February 27, 1961, plaintiff, a common carrier of freight and passengers for hire, with its tariffs duly posted, brought the action against defendant for freight charges allegedly due on account of the hauling by plaintiff of certain carloads of "machinery parts, iron and steel" for defendant. Defendant answered the complaint by alleging in effect that plaintiff had hauled 343 carload shipments of

"fabricated structural steel forms" on behalf of defendant and that the latter had paid $53,109, the full and correct amount required by plaintiff's tariffs on account of the transportation of such forms.

It is agreed that if there should be a judgment against defendant the amount should be $80,511.17. After a trial the court ordered judgment for plaintiff in the amount as indicated, plus interest and costs. This appeal followed.

There is no controversy as to the facts.

The sole question involved is whether under plaintiff's posted tariffs the fabrication in transit privilege should be granted to the shipments in question.

A joint pretrial statement (incorporated into and made a part of the pretrial order) sets forth in part certain matters agreed upon between the parties.[1]

---

[1]"Certain unfabricated steel materials, including but not limited to angles, bars, forgings, plates, rods, sheets and tubing, were shipped by defendant via railroad from its mill sources located at South Chicago, Illinois, and Geneva, Utah, to its plant at South San Francisco, California. At the latter named point, defendant fabricated said steel materials into articles or products, the description of which for tariff classification and freight rating purposes is in dispute. After the work was performed at South San Francisco, defendant shipped said articles or products in 343 carload shipments, referred to in the First Amended Complaint, via plaintiff's railroad to its plant at Maywood, California, describing said shipments as fabricated structural steel forms, NOIBN. At Maywood, manufacturing and further fabrication work was performed on said articles or products. At the time of shipment from South San Francisco to Maywood, defendant claimed the privileges of transit and freight charges in the sum of $53,109.25 were paid by defendant to plaintiff, predicated upon fabrication in transit privileges being proper and allowable under the circumstances and pursuant to applicable freight tariff rules.

"4. Fabrication in transit is a privilege granted to shippers by tariff. It embodies the fiction of through movements of freight moving at through rates. It allows certain basic steel mill products to be shipped to a fabrication plant, stopped in transit, unloaded, fabricated and after fabrication to be shipped on to the ultimate destination of the fabricated product for a through rate. The through rate to be assessed is determined by application of the rules of Item 1000 of Pacific Southcoast Freight Bureau Freight Tariff 264-F, a true and correct copy of which is attached hereto, by reference made a part hereof, and marked Exhibit 'A.' Fabrication in transit privileges apply at fabrication points called transit stations, which are intermediate between the mill source and ultimate destination of the fabricated product. South San Francisco is an authorized transit station with respect to the instant shipments, if transit privilege is applicable. In order to achieve the fabrication in transit privilege, the inbound commodity, the fabrication processes, and the outbound fabricated commodity must all comply with requirements of Item 3610-B of Supplement No. 64 to Pacific Southcoast

The tariff item referred to in the pretrial statement, pretrial order (Exhibit B) and throughout the trial is set forth in the footnote.[2]

Further, the plaintiff set forth its contentions in part in the pretrial statement to the effect that the products at the time of shipment from South San Francisco to Maywood, California, were properly classified as machinery parts, rather than fabricated structural forms—that defendant did not comply with the third requirement set forth in Column 3 of the tariff (footnote 2) because the fabrication performed by defendant on the inbound steel articles resulted in the creation of machinery parts which were shipped outbound—that machinery parts, iron or steel, are not authorized as outbound commodities under the Column 3 of the tariff item (footnote 2) and fabrication privileges are not proper or allowable under the circumstances. In other words, it is contended by plaintiff that if the fabrication allowed under Column 2 of the tariff (footnote 2) results in an item not named in Column 1 of the set forth tariff, then the transit privilege is to be disallowed.

---

Freight Bureau Freight Tariff 264-F, a true and correct copy of which is attached hereto, by reference made a part hereof, and marked Exhibit 'B.'

"5. The commodities contained in the 343 shipments described in the complaint, consisted solely of what ultimately became (a) Base Frames (b) Erecting Beams and (c) Trunnions for Nike B Launcher Assemblies.

"6. Said unfabricated steel materials received at defendant's plant in South San Francisco consisted solely of articles described in Column 1 of Item 3610-B.

"7. The fabrication performed on said materials at South San Francisco consisted solely of fabrication processes described in Column 2 of Item 3610-B.

"8. If it is ultimately determined as a matter of law that fabrication in transit privileges were proper and allowable as to the instant shipments, and that fabrication processes at South San Francisco had not resulted in the articles or products becoming other than as described in Column 3 of Item 3610-B, the amount defendant has heretofore paid to plaintiff as freight charges ($53,109.25) is the correct and total amount due.

"9. If it is ultimately determined as a matter of law that the articles or products shipped from South San Francisco are properly classified under applicable tariffs as machinery parts, iron or steel, NOIBN, defendant owes to plaintiff, pursuant to the provisions of applicable tariffs, freight undercharges in an additional amount of $80,511.17, and judgment may be rendered accordingly. (NOIBN means not otherwise indexed by number.) "

[2]See page 98.

Defendant contended that it had complied with all of the requirements of the tariff item as published and posted, that (admittedly) the inbound shipment received in South San Francisco consisted of items specifically listed in Column 1 of the tariff in question and (admittedly) the fabrication was done solely by the processes mentioned and set forth in Column 2 of the tariff. Further, that the outbound commodities here were items as described in Column 3 of the tariff because among other things they were only partially fabricated at South San Francisco, and were to be completed at their plant in Maywood—that the items as shipped from South San Francisco were useless as parts of any missile launcher assembly and a great deal of work was necessary to be performed on said items at the plant at Maywood before

---

Sup. 64 to Tariff 264-F

## SECTION 1—MISCELLANEOUS TRANSIT PRIVILEGES
### Stopping Shipments in Transit, Subject to Rules and Regulations Referred to in Item 900

☒Item 3510-B

Subject to Rules, Regulations, Conditions and Charges prescribed in this Tariff, the transit privileges on carload shipments of Iron or Steel Articles are confined to the inbound commodities described in Column 1 below. The fabrication in transit privileges thereon are confined to those privileges named in Column 2 below. The outbound commodities are confined to those commodities described in Column 3 below.

### ARTICLES

| Para-graph | Column 1<br>INBOUND COMMODITIES | Column 2<br>TRANSIT PRIVILEGES—FABRICATION, Viz.: | | Column 3<br>OUTBOUND COMMODITIES<br>will consist of: (See Note A): |
|---|---|---|---|---|
| A | Iron or Steel Articles, unfabricated as from the mill, viz.: Angles, Bands, Bars, Beams, Bolts, ⓢCastings, Channels, Columns, NOIBN, other than sheet metal; Ells, ⓢForgings, Girders, Masts, Nuts, Plates, Rivets, Rods, including Welding Rods (except Coiled Rods), Sheets, Sheet Bars, SkeIP, Strips, Tees, Trusses, ⓢTubing, Washers, Zees. | Annealing<br>Beveling<br>Bending<br>Boiling<br>Boring<br>Burning<br>Counter-Sinking<br>Cutting<br>ⓢDipping<br>Drilling<br>Drawing<br>Expanding<br>Flanging<br>Gaging<br>Galvanizing | Grinding<br>Painting<br>Pickling<br>Planing<br>Polishing<br>Punching<br>Reaming<br>Riveting<br>Sawing<br>Shearing<br>Straightening<br>Threading<br>Turning<br>Twisting<br>Welding<br>ⓢWrapping | Iron or Steel Articles named in paragraphs A, B or C when further treated under any process or processes named in paragraphs A, B and C.<br>ⓢIron or steel parts when shipped unassembled or partially assembled and/or for further assembly as bridges, buildings and similar products of construction work.<br>ⓢBlanks, viz.:<br>Cartridge Case Discs.<br>ⓢCulverts.<br>ⓢPipe.<br>ⓢTanks, SU, KD, or in sections.<br>ⓢTubing. |
| B | Pipe or Tubing, iron or steel. | Coating<br>Dipping | Galvanizing<br>Wrapping | |
| C | Pipe or Tubing, iron or steel. | Affixing pipe couplings or joints.<br>Upsetting | Threading | |
| D | Wire, iron or steel. | Twisting | | ⓢRope or Cable, wire. |

Note A—If outbound material consists of completed parts or completed articles (except as otherwise provided), no transit privilege will be allowed.
ⓢApplies only on Pipe or Tubing on traffic originating at Kaiser, Cal., and destined points in TCFB Territory, and only when transit is performed at Baldwin Park, Cal.
ⓢCoating and Dipping applies only at points in Oregon, except when transit will also apply on Pipe or Tubing originating at Kaiser, Cal., and destined points in TCFB Territory, when transit is performed at Baldwin Park, Cal.
ⓢNot subject to privilege of threading or re-threading.
ⓢNOIBN, as described in WC.
ⓢNot subject to Note A.

they could be used for the purposes intended. Furthermore that if the tariff is ambiguous it must be construed against the carrier. The issue was stated to be *whether fabrication in transit privileges are applicable to the articles or products shipped in the 343 carload shipments referred to in the first amended complaint. If fabrication in transit privileges are not applicable, a further issue will be the proper classification of the articles shipped for the determination of the proper freight charges.*

The privilege of transit under the circumstances simply means that the shipper shall have a right under certain circumstances to have cars stopped at a designated intermediary point, the commodity in the course of the shipment to be unloaded and worked upon and then reloaded and shipped to its destination as if it had been in continuous shipment and at the same rate as originally billed. In other words if the defendant is correct in its contentions the privilege of transit enabled it to ship steel items (as described in Column 1 of the tariff set forth in footnote 2) from its plant at Geneva, Utah, to its plant in South San Francisco, and there unload the steel so shipped and fabricate the same in its plant (as described in Column 2 of the tariff) then reload the same steel, as fabricated and ship the same to its plant at Maywood, California, for further work and manufacturing, all at a rate comparable to a through rate, and with the two legs of the journey to be treated as if they were covered without interruption, uniting the two into a through route for the joint rate. See *Central Railroad Co. of New Jersey v. United States,* 257 U.S. 247 [42 S.Ct. 80, 66 L.Ed. 217, 221] ; *Boone v. United States,* 109 F.2d 560, 562-563; *Big Diamond Mills v. Chicago Great Western Railway Co.,* 178 Minn. 432 [227 N.W. 430] ; *Parkersburg Rig & Reel Co. v. B. & O. Railway Co.,* 109 I.C.C. 569, 575.

The evidence is that appellant at its Maywood plant was producing a launcher assembly for the Nike Hercules missile —an item consisting of 15,000 parts, extremely complicated and of fine tolerances and precision. The steel plates, etc., were shipped from Geneva, Utah, to South San Francisco, unloaded ard the fabrication there was done on machines, the replacement value of which would be about $40,000. There was no government inspection of the work done at South San Francisco apparently because of the unfinished and uncom-

pleted state of the parts and their inability to function as parts of the missile launcher as such.

The parts or steel as fabricated at South San Francisco were then loaded and shipped over respondent's railroad to appellant's plant at Maywood where precise machining was performed by complex machinery, the replacement of which would be about $3,500,000 and only after this work was done did the government perform any substantial inspection.

▮ The trial judge found in effect that because the articles as fabricated specifically became a part of a missile launcher and were not adapted to any other use, they had a single utility and were designed to begin with to be an integral part of a missile launcher; therefore they lost their identity as iron or steel articles and the privilege of transit would not apply.

We think the judgment is improper.

By the nature of things no useful purpose would be served in providing for the fabrication privileges if the fabrication process permitted was of no usefulness to the shipper.

In *Union Wire Rope Corp.* v. *Atchison, Topeka & Santa Fe Railway Co.,* 66 F.2d 965, 969, it is stated in effect that "fabrication" is substantially the same as "manufacture" and the shipper was allowed to fabricate steel rods into wire rope. ▮ There is nothing we can find in our independent research to the effect that "fabrication" requires that the identity of the component materials be preserved or that the component materials made have more than a single utility.

▮ The tariff must be construed against the railroad and in favor of the shipper in the event of any ambiguity. *Atlantic Coast Line Railway Co.* v. *Atlantic Bridge Co., Inc.,* 57 F.2d 654; *Union Wire Rope Corp.* v. *Atchison, Topeka & Santa Fe Railway Co.,* 66 F.2d 965, 967; *Transmix Corp.* v. *Southern Pacific Co.,* 187 Cal.App.2d 257, 267 [9 Cal.Rptr. 714]; *Brant* v. *California Dairies, Inc.,* 4 Cal.2d 128, 133 [48 P.2d 13]; *Wechsler* v. *Capitol Trailer Sales, Inc.,* 220 Cal.App.2d 252 [33 Cal.Rptr. 680]; *Hartford Acc. & Indem. Co.* v. *Bank of America,* 220 Cal.App.2d 545 [34 Cal.Rptr. 23].

The tariff here (footnote 2) indicates in Column 2 the 32 operations or things which can be done by way of fabrication on the inbound steel. It would seem to be obvious that a piece of steel which in accordance with specifications has been beveled, bent, bored, counter sunk, drilled, expanded, ground, planed, punched, reamed, riveted, sawed, sheared, threaded,

twisted and welded, would no longer be an "iron or steel article, unfabricated as from the mill." Fabrication as indicated is allowable and certainly it is contemplated that there will be considerable change in many respects from ordinary unfabricated steel "as from the mill."

It is noted that the tariff (footnote 2; Note A) does not permit of the transit privilege if the fabrication results in "completed parts or completed articles." The outbound items in this case were not in any sense completed. It would seem that if, as the tariff provides, it does not apply to completed parts that then it does apply to uncompleted parts, otherwise it applies to nothing.

In the case of *Commercial Shearing & Stamping Co.* v. *B. & O. Railroad Co.,* 296 I.C.C. 511, the tariff there under consideration was very similar to the tariff in this case. The question there was whether the partial fabrication of tank heads was permitted by the tariff. It is stated:

"Before determining the kind of process used by complainant in forming tank heads it is necessary to decide whether the method used in converting the steel plate into tank heads is a manufacturing process as distinguished from one of fabrication. The governing tariffs apply only in connection with the fabrication of *steel articles,* including steel plate stopped at the fabricating point for bending, flanging, and/or shearing, among other processes. *If the tank heads are to be formed by a fabrication method, it must also be determined if they are uncompleted articles,* and if found to be a completed article, whether they are to be further assembled into completed structures; such as bridges, buildings, or ships. *If the method used is one of fabrication, and the tank head is an uncompleted article* or a completed article to be further assembled into a completed structure such as a bridge, building or ship, *the tariff provisions are applicable."*

The commission determined first that the tank heads were not completed articles:

"In the prior report division 2 found that the tank heads were completed parts. The evidence introduced on this issue now shows that the edge of the tank heads must be trimmed by the consignees before they can be welded to the tank. Thus, these tank heads may not be considered as completed parts until ready to be made a part of the tank. *The fact that further operations must be performed by the consignee,* such

as trimming, and in some instances cutting holes in the head for the insertion of valves and other appurtenances, *clearly shows that the tank heads in question are not completed articles at the time shipped, within the meaning of the governing tariffs.* This conclusion renders inoperative the tariff provision dealing with the applicability of the transit tariffs to completed articles shipped to be assembled into completed structures such as bridges, buildings, or ships.''

''. . . . . . . . . . . .

''(1) the steel plates received by the complainant are rectangular, (2) the first operation performed is the shearing of such plates to circular shapes as permitted by the transit rules, (3) a lubricating compound is then placed on the circular steel plate and the plate is placed on a ring, (4) a convex pad in a single-action press is then forced down upon the plate and to prevent shifting or unevenness in the plate, an outer ring is attached to the upper moving part of the press and descends until it is in contact with the plate, (5) the pressure exerted by the press 'stamps' the first circular plate into a flanged and dished plate, and (6) sometimes the flange is sheared from the dished plate.''

Transit privilege was granted in *Commercial Shearing.*

In *Union Wire Rope Corp.* v. *Atchison, Topeka & Santa Fe Railway,* 66 F.2d 965, the court had the problem similar in nature to the present case. It is there said :

''The sole substantial issue here is whether these shipments were entitled to be made under a stoppage in transit through rate tariff in force by the Wabash Railway Company, the initial connecting carrier. That issue arises as follows : Appellant bought steel rods at Chicago and shipped them via the Wabash to Kansas City, where it operated a wire rope factory. At Kansas City, the rods were subjected to a heating process and certain chemical treatment to prepare them for drawing into wire. Then they were, in repeated operations, drawn through dies of lessening sizes into steel wire. This wire was woven into strands which were woven about a central core of manila rope so as to form wire rope, the finished product. It is this wire and wire rope which were shipped to various interstate destinations over the line of appellee that are the subject of this action.

''. . . . . . . . . . . .

''A rate tariff is in essence a statement by the carrier to possible shippers that it will furnish certain services under

certain conditions for a certain price. When a tariff has become legally promulgated, it is binding upon both the carrier and any shipper taking advantage of it, and its terms (in essence) become, in such respects, the only contract between the two allowed by law. Since the tariff is written by the carrier, all ambiguities or reasonable doubts as to its meaning must be resolved against the carrier.

"       .     .     .     .     .     .     .     .     .     .     .     .

"The tariff involved here is addressed to a class. That class is those who work upon 'Articles of Iron and Steel, viz: Angles, Bars, Beams, Bolts, Castings, Channels, Columns, Girders, Nuts, Plates, Rivets, Rods, Sheets, Tees, Tubular Iron or Steel (unfabricated from rolling mills) or Zees.' The tariff tells that class what they can do with the above iron and steel articles at the transit points and retain the tariff through rate. What they can thus do is stated as 'Reworking or assembling (called the fabrication herein).' These words 'Reworking or assembling' are broad and general in ordinary meaning.

"       .     .     .     .     .     .     .     .     .     .     .     .

"[T]he shipper is permitted to do anything reasonably included in the words 'Reworking or assembling.' Since these words are 'called fabrication herein' .(meaning the entire tariff), we examine the use of the word 'fabrication' in other parts of the tariff. It is frequently used therein but the only use pertinent to our inquiry is 'Rule 25,' entitled 'Consolidation,' which reads as follows: 'The fabricator is not required to preserve the identity of unfabricated material; it may be consolidated in the fabricating plant and applied in accordance with the provision shown on page 3 against the tonnage balances of each carrier without regard to the origin of the material.'

"From this it appears (a) that *the identity of the shipped in material need not be preserved, and (b)* that such may be 'consolidated in the fabricating [reworking or assembling] plant.' Obviously Rule 25 suggests a broad rather than a narrowed meaning of 'Reworking or assembling.'

"       .     .     .     .     .     .     .     .     .     .     .     .

"From this wording of the tariff and its application to actual conditions affecting the articles dealt with therein when initially shipped, it would appear that *the shipper would reasonably and properly understand the tariff as giving him*

*a wide range of change and treatment of the rods at the transit point.*

" . . . . . . . . . . . . . .

"From what has been said, the conclusions are that *the tariff is very broad and general in its definition of what may be done to the rods at the transit points*; that the evidence and findings strongly tend to prove the treatment of the rods by appellant to be within the tariff whether construed in the ordinary meaning of the words as applied to the situation or in the customary meaning of the trade to which they are to be applied, that appellee has failed to sustain its burden of proof to show that such treatment was outside the tariff; and that the judgment must be reversed."

Neither *Commercial Shearing* nor *Union Wire* required that the identity of the inbound steel articles need be preserved or that the outbound articles have general utility as mill steel. See also *Mueller-Huber Grain Co.* v. *Texas & N. O. R. Co.* (Tex. Civ. App.) 193 S.W.2d 573; *In re Blumenthal,* 51 F. 76, 78; *Webrib Steel Corp.* v. *Reading Co.,* 281 I.C.C. 491.

Had the respondent wanted its present interpretation put upon the tariff it would have been an easy matter in the first instance to have added one short sentence in a footnote to the tariff supplement to the effect that under the circumstances as here presented the fabrication and transit privilege would not apply. It did not do so. Respondent was fully aware of the case of *Texas Steel Co.* v. *Mission K-T Railroad Co.,* 225 I.C.C. 337, 339, where it is stated:

"In the case of most commodities, including structural steel, it is impractical to preserve the identity of the material in and out of the transit point, and in such instances, reasonable and proper substitution always has been the practice."

The judgment is reversed and the trial court is directed to enter a judgment in favor of the appellant United States Steel Corporation, Consolidated Western Steel Division, a Delaware corporation.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied August 31, 1964, and respondent's petition for a hearing by the Supreme Court was denied October 7, 1964.