UNCLE JOE'S INCORPORATED,
Appellant and Cross–
Appellee,

v.

L.M. BERRY AND COMPANY, d/b/a
The Berry Company, Appellee
and Cross–Appellant.

Nos. S–11516, S–11545.

Supreme Court of Alaska.

April 6, 2007.

Rehearing Denied May 15, 2007.

Jeffrey J. Jarvi, Anchorage, for Appellant and Cross–Appellee.

Douglas S. Parker, Dennis J. Efta, Preston Gates & Ellis, LLP, Anchorage, for Appellee and Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

Uncle Joe's, Inc., appeals and L.M. Berry and Company cross-appeals in a case arising from errors in entries for Uncle Joe's Pizzerias in both the White and Yellow Pages of the 2002–2003 Anchorage telephone directory. Uncle Joe's challenges the grant of summary judgment to Berry on the interpretation of an exculpatory tariff, the superior court's refusal to order Berry to produce attorney-client communications, and the award of attorney's fees and costs to Berry. Berry appeals from an order on summary judgment declaring the limitation of liability provision in its pre-printed order form for Yellow Pages advertisements invalid. We reverse the superior court's decision on the effect of the tariff. This requires that the award of attorney's fees also be vacated. Uncle Joe's discovery argument is moot as is Berry's argument regarding the limitation of liability clause.

### The White and Yellow Pages Directory Errors

Uncle Joe's operates five pizzerias in Anchorage. It is primarily a take-out and delivery business relying heavily on the promotion of its name and telephone number. Berry publishes telephone directories for telephone companies throughout the United States. Berry contracted with Alaska Communications Systems (ACS) in the mid–1990s to publish Anchorage telephone directories. By 2002 the ACS directory was used by eighty-six percent of customers in the area.

An error in Uncle Joe's listing appeared in the 2002–2003 White Pages Directory published by Berry. The address and telephone number for each of Uncle Joe's five pizzeria outlets was listed, but the name "Uncle Joe's Pizzeria" was omitted. Without the business name, Uncle Joe's information was listed under the name "Uncle George the Clown." As a result, Uncle Joe's claims that it lost revenues of $435,153.64 between June 1, 2002, and June 1, 2003, and was forced to lay off three employees and relocate its corporate office to the home of its president.

A minor error concerning Uncle Joe's also appeared in an advertisement in the 2002–2003 Yellow Pages Directory, also published by Berry. Uncle Joe's advertisement was published with the graphic designer's digital watermark still included, resulting in a faint cross within a circle design appearing in the middle of the advertisement. Uncle Joe's had ordered the Yellow Pages advertisement on Berry's Directory Advertising Order, which contained standard terms and conditions pre-printed on the reverse side. Section 8 of these conditions limits the liability of both ACS and Berry for errors in printed advertisements to "the amount paid by the advertiser for said item of advertising" and further applies the limitation of liability "to any and all claims whether in contract, tort, strict liability or otherwise, and to any loss of business, profits, or additional advertising costs incurred."

### Proceedings

Based on these errors, Uncle Joe's filed suit against Berry under theories of negligence, gross negligence, and defamation,

seeking compensatory and punitive damages. Subsequently, Uncle Joe's filed a motion for partial summary judgment. In this motion Uncle Joe's sought a ruling that Berry's affirmative defense that its liability is limited by the provisions of an exculpatory tariff filed by ACS[1] lacked merit. Similarly, the motion challenged Berry's affirmative defense that its liability is limited by section 8 of the conditions in its Yellow Pages order form. Berry cross-moved for summary judgment on both affirmative defenses, seeking dismissal of Uncle Joe's claims. While these motions were pending and as trial approached, Uncle Joe's made a motion to compel the production of documents that Berry had withheld from discovery under the attorney-client privilege. Uncle Joe's argued that the fraud exception to the attorney-client privilege required production of the documents. Uncle Joe's theory was that Berry had been deceiving Alaska customers by using the limitation of liability clause in its Yellow Pages order form while knowing that such clauses had been ruled invalid in *Municipality of Anchorage v. Locker*.[2] This deceit, Berry argued, amounted to fraud under the fraud exception to the attorney-client privilege and thus the documents in question were not shielded by the privilege.

In an order dated April 22, 2004, the superior court denied Uncle Joe's motion for partial summary judgment concerning the tariff and granted Berry's cross-motion for summary judgment on that issue. The court denied Berry's cross-motion for summary judgment concerning the Yellow Pages liability limitation clause and implicitly granted Uncle Joe's motion for partial summary judgment on that issue.

On April 26, 2004, the superior court denied Uncle Joe's motion to compel, ruling that the "civil fraud exception does not apply in this case."

On May 14, 2004, the parties stipulated to a final judgment, which provided that Uncle Joe's would recover nothing from Berry for its claims based on the omission of Uncle Joe's name from the White Pages and that Uncle Joe's "shall recover from [Berry] nominal damages in the amount of $10.00 for [Uncle Joe's] negligence claim based on the 2002–2003 ACS Anchorage Yellow Pages." The stipulation left for adjudication the question of the award of fees and costs and provided as follows with respect to appeals: "This order shall constitute an appealable final judgment; specifically, all rulings made in the Court's Order dated April 22, 2004, shall be appealable by either party." The stipulation was "so ordered" by the superior court.

Subsequent to entry of the stipulated judgment, Berry moved for an award of attorney's fees and costs based on an offer of judgment that it had made pursuant to Civil Rule 68 that Uncle Joe's had not accepted. The court granted Berry's motion and awarded attorney's fees of $54,266 and costs of $5,056 to Berry.

Uncle Joe's now appeals from the court's ruling of April 22, 2004, that the exculpatory tariff applied to Berry, from the court's refusal to require the production of attorney-client communications, and from the award of attorney's fees and costs to Berry. Berry cross-appeals, claiming that the court erred in its order of April 22, 2004, when it ruled that the limitation of liability clause in the Yellow Pages order form was invalid.

**The April 22, 2004 Decision of the Superior Court**

The superior court's decision with respect to whether the exculpatory clause of the tariff applied to Berry was as follows:

Uncle Joe's argues that the Tariff Advice only applies to ACS and not to the Berry company. Berry on the other hand contends that the focus should be on the activity regulated and not the entity that performs the function. It is undisputed

---

1. The exculpatory tariff provided:

   Errors—No liability arising from errors or omission [sic] in the making up or printing of its directories shall be attached to Alaska Communications Systems except in the case of charge listings. After reasonable notice is provided in writing to Alaska Communications Systems in connection with these, its liability shall be limited to a refund at the monthly rate for each listing.

2. 723 P.2d 1261 (Alaska 1986).

that ACS does not publish its own telephone directory. Instead, ACS has had a longstanding relationship with the Berry company as the publisher of its directories. It is also undisputed that the [Regulatory Commission of Alaska (RCA) ] is aware of this relationship and that ACS does not publish its own directories. This issue is substantially similar to the one presented in *Municipality of Anchorage v. Locker*, 723 P.2d 1261, 1262 (Alaska 1986)[,] where Yellow Pages advertisers whose ads were published incorrectly sued the telephone utility and its publisher for damages. In *Locker*, the Court treated the publisher as the utility's agent. *Id.* at 1261, fn. 1. In *Simpson v. Phone Directories Co.*, [82 Or. App. 582,] 729 P.2d 578 (Or.App.1986), the court drew a distinction between the regulated service of published phone listings as opposed to unregulated phone listings. Where the listing is regulated, limited liability was imposed. This court finds that the publication of the White Pages is governed by the RCA and imposes limited liability on Berry. Accordingly, Berry is subject to the limited liability protection contained in Tariff Advice 416–120.

The court's decision with respect to the liability-limiting provision of the Yellow Pages order form was as follows:

> However, this liability limitation only applies to statutorily required services, *i.e.*, the alphabetical listings. As the Alaska Supreme Court stated in *Locker*:
>
>> Yellow Pages advertisements are not a telecommunication service. To apply the tariff provision to such advertisements we would imply that [the RCA] could regulate the Yellow Pages. We decline to imply such regulatory authority. The administrative regulations explicitly make publication of the Yellow Pages optional.
>
> *Id.* at 1264.

The next question, then, is whether Berry's contract for Yellow Pages advertising with Uncle Joe's will shield it from liability for the alleged mistake in the 2002/2003 ACS Yellow Pages. When presented with a similar question, the Court in *Locker* answered in the negative, reasoning that the contract entered into between the utility—then ATU—and its advertisers was unconscionable. *Id.* at 1266–1267.

Berry invited this court to overrule *Locker*. At the time the Alaska Supreme Court decided *Locker*, the court was aware that it was adopting the minority position. Although some of the jurisdictions relied on in *Locker* have since changed to the majority position, it is not the place of this court to disregard clearly decided Alaska law.

Further, the factors that led the Court in *Locker* to conclude that publication of Yellow Pages is affected with a public interest have not changed: Yellow Pages still serve the public, and Yellow Pages advertising still provides an affordable way for small businesses to advertise. Courts are permitted to give heightened scrutiny to businesses that hold themselves out as willing to provide such services. Accordingly, Berry, as a provider of a public service, may not shield itself from its own negligence. Whether or not a duty was breached and the amount of damages, if any, are questions for a jury to decide.

Therefore, this court concludes that Plaintiff's damages for the omission of its name from the regular listings are limited by tariff, while any provable damages as a result of the blemish in the Yellow Pages are not so limited.

## The Exculpatory Clause in the Tariff Does Not Apply to Berry

Uncle Joe's argues that the tariff does not extend to Berry because exculpatory and limitation of liability clauses are disfavored in Alaska and are strictly construed against the drafter. One consequence of the rule of strict construction is that ambiguities in exculpatory clauses will, where reasonably possible, be resolved against the drafter. Uncle Joe's argues that this rule applies to tariffs and that the tariff in this case is ambiguous with respect to whether it applies to Berry because it mentions only ACS, not those with whom ACS contracts.

Berry argues that the exculpatory tariff does apply to Berry even though it does not refer to Berry by name or description. In

support of this position Berry argues that in *Municipality of Anchorage v. Locker,*[3] this court treated the liability of the telephone company's contract publisher "the same" as the liability of the telephone company. Berry also argues that the RCA has jurisdiction over the White Pages publication and that a tariff should be construed like a statute, rather than strictly against the drafter. Berry contends that exposing contract publishers to liability for mistakes would subject them to inordinate expenses, which ultimately would be borne by telephone customers in the form of elevated rates. Berry concludes:

> In view of the statutory framework under which the RCA operates and the related policy concerns, [the court] interpreting the ACS Tariff should determine if the Tariff is consistent with and reasonably necessary to carry out the purposes of the statutory provisions, and whether the [Tariff] is reasonable and not arbitrary. (Quotations and citation omitted.)

The tariff explicitly applies only to "Alaska Communications Systems." It does not purport to apply to entities with which ACS contracts. Thus, under a literal application of the tariff, only ACS is exculpated from liability arising from errors or omissions in its directories. Only if the tariff is to be broadly read could contractors with ACS also be brought within the coverage of the tariff. We believe that either a literal reading—in which the tariff applies only to ACS—or a broadened reading—in which the tariff also applies to entities that print ACS directories under contract with ACS—is reasonably possible. In this sense, then, the tariff is ambiguous.

Uncle Joe's is correct that in a non-tariff contractual setting this court has held that exculpatory language should be narrowly construed. Our case law teaches that the law disfavors—and sometimes positively forbids[4]—contractual exculpatory clauses.[5] As we stated in *Bank of California v. First American Title Insurance Co.:*

> [A]s a general rule, contractual limitations on liability for negligence must be "clearly set forth." *Dresser Indus. Inc. v. Foss Launch & Tug Co.,* 560 P.2d 393, 395 (Alaska 1977). " 'If the defendant seeks ... to escape responsibility for the consequences of his negligence, then [the disclaimer] must so provide, clearly and unequivocally, as by using the word "negligence" itself.' " *Kissick v. Schmierer,* 816 P.2d 188, 191 (Alaska 1991).[6]

In *Kissick* we stated that an agreement purporting to exculpate the drafter from liability for negligence or tortious conduct is not effective unless the agreement is "clear, explicit and comprehensible in each of its essential details."[7]

There are a number of reasons why contractual exculpatory clauses are disfavored and strictly construed. First, they alter the normal rule that a party is responsible in damages for its negligent conduct.[8] Second, they are typically imposed on a take-it-or-

**3.** 723 P.2d 1261, 1262 n. 1 (Alaska 1986).

**4.** We have indicated that exculpatory provisions are prohibited, as distinct from being merely narrowly construed, where they are imposed on consumers by a business affected with the public interest. Thus, in *Bank of California v. First American Title Insurance Co.,* we held that a title company's effort to disclaim liability for negligence was ineffective because "[a] title company is engaged in a business affected with the public interest and cannot, by an adhesory contract, exculpate itself from liability for negligence." 826 P.2d 1126, 1130 (Alaska 1992) (quoting *White v. Western Title Ins. Co.,* 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 315–16 (1985)). In support of the same proposition we also cited *Locker,* 723 P.2d at 1265–66, giving the following parenthetical explanation: "[E]xculpatory clauses are unconscionable where 'circumstances in-

dicate a vast disparity of bargaining power coupled with terms unreasonably favorable to the stronger party.' " *Bank of Cal.,* 826 P.2d at 1130.

**5.** See *Ledgends, Inc. v. Kerr,* 91 P.3d 960 (Alaska 2004); *Bank of Cal.,* 826 P.2d at 1130; *Dresser Indus. v. Foss Launch & Tug Co.,* 560 P.2d 393, 395–96 (Alaska 1977).

**6.** 826 P.2d at 1130.

**7.** 816 P.2d at 191.

**8.** *E.g., Valhal Corp. v. Sullivan Assocs.,* 44 F.3d 195, 202 (3d Cir.1995) (holding exculpatory clauses are disfavored and strictly construed since parties should not be lightly permitted to shed their liability for negligence).

leave-it basis, rather than negotiated.[9] Third, the party benefitting from the clause is usually much stronger economically than the party left without legal recourse.[10] Fourth, the party benefitting from the clause usually has drafted it, and it is regarded as fair to construe ambiguities against the party that is responsible for them.[11]

Here, the clause is contained in a tariff rather than in a contract. The question is whether the rule of strict construction that we have applied in a contractual setting applies to tariffs.

Tariffs in Alaska, as in most other jurisdictions, are drafted by the utility. They become applicable unless rejected by the RCA within forty-five days after they are filed.[12] Tariffs control the terms and conditions under which a utility offers its services to the public.[13] Tariffs containing liability limita-

tions or exculpatory provisions are thus like contracts containing similar provisions in at least two respects. They purport to govern the relationship between the parties, and they are drafted unilaterally by the party seeking the benefit of the provision.

Numerous authorities in other jurisdictions indicate that when a tariff is ambiguous it should be construed like a contract and thus favorably to the customer and against the drafter. As the Supreme Court of Illinois has recently stated: "[B]ecause the utility company drafts a tariff, it is generally accepted that language in a tariff, especially exculpatory language, is to be strictly construed against the utility company and in favor of the customer." [14] This rule is widely recognized.[15] We think that it should be applied in Alaska.

---

**9.** *See, e.g., Kissick,* 816 P.2d at 191 (holding that exculpatory provisions should be strictly construed when found in contracts of adhesion).

**10.** *E.g., Locker,* 723 P.2d at 1265 (holding that the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services).

**11.** *E.g.,* RESTATEMENT (SECOND) OF CONTRACTS § 206 cmt. a (1981) (stating that construing ambiguities against the drafter discourages them from surreptitiously including terms to which the nondrafting party did not agree).

**12.** AS 42.05.361(c).

**13.** AS 42.05.371.

**14.** *Adams v. N. Ill. Gas Co.,* 211 Ill.2d 32, 284 Ill.Dec. 302, 809 N.E.2d 1248, 1271 (2004).

**15.** *See, e.g., Komatsu, Ltd. v. States S.S. Co.,* 674 F.2d 806, 811 (9th Cir.1982) ("As the carrier is the tariff's author, ambiguities in its language must be strictly construed against the carrier."); *Norfolk & W. Ry. Co. v. B.I. Holser & Co.,* 629 F.2d 486, 488 (7th Cir.1980) ("[T]he tariff should be construed strictly against the carrier since the carrier drafted the tariff; and consequently, any ambiguity or doubt should be decided in favor of the shipper."); *Cont'l Can Co. v. United States,* 272 F.2d 312, 315 (2d Cir.1959) (holding "[a]mbiguity should be resolved against the carrier where the tariff, having been written by the carrier, is vulnerable against the carrier if the tariff's meaning is ambiguous") (quotations omitted); *United States v. Interstate Commerce Comm'n,* 198 F.2d 958, 966 (D.C.Cir.1952) ("Since the tariff is written by the carrier, all ambiguities or reasonable doubts as to its meaning must be resolved against the carrier."); *Nat'l Telecomms.*

*Ass'n v. Am. Tel. & Tel. Co.,* 1997 WL 466556, at *4 (S.D.N.Y.1997) ("A tariff between a carrier and its customer is a contract and as such is to be interpreted according to general principles of contract law. Under general principles of contract law, I must resolve ambiguities in the tariff language against the carrier and in favor of the customer.") (citations omitted); *Pink Dot, Inc. v. Teleport Commc'ns Group,* 89 Cal.App.4th 407, 107 Cal.Rptr.2d 392, 397 (2001) ("The rule has been stated many times that if there is an ambiguity in a tariff any doubt in its interpretation is to be resolved in favor of the [nondrafter and against the utility]."); *S. Pac. Co. v. U.S. Steel Corp., Consol. W. Steel Div.,* 229 Cal.App.2d 94, 40 Cal.Rptr. 135, 139 (1964); *Transmix Corp. v. S. Pac. Co.,* 187 Cal.App.2d 257, 9 Cal.Rptr. 714, 719 (1961) ("Tariffs are strictly construed...."); *State Farm Fire & Cas. Co. v. S. Bell Tel. & Tel. Co.,* 245 Ga. 5, 262 S.E.2d 895, 897 (1980) (referring to tariffs, the court stated: "Prepared by [the utility], they must be strictly construed in favor of the customer. If a contract is of doubtful meaning, it is to be construed against the party who drew it. Generically, the Tariff must be viewed as a contract between [the utility] and its customers, affirmed on behalf of the latter by the Public Service Commission.") (quotations and citation omitted); *Estate of Pearson ex rel. Latta v. Interstate Power & Light Co.,* 700 N.W.2d 333, 343 (Iowa 2005) ("If a tariff is ambiguous, we strictly construe the language of a tariff against the drafter, the utility."); *Marriott Corp. v. Chesapeake & Potomac Tel. Co. of Md.,* 124 Md.App. 463, 723 A.2d 454, 460 (1998) ("In the event of an ambiguity, a tariff, like any other contract, must be strictly construed against the drafting party."); *Info Tel Commc'ns, LLC v. U.S. W. Commc'ns, Inc.,* 592 N.W.2d 880, 884 (Minn. App.1999) ("[I]n interpreting a tariff .... where there is ambiguity, the tariff language should be

■ We adopt the rule that exculpatory clauses in tariffs should be strictly construed against the utility and in favor of the customer because all the reasons for disfavoring such clauses in contracts also apply to tariffs. Tariff exculpatory clauses alter the normal rule that an entity is responsible for the consequences of its negligent conduct; they are imposed on a take-it-or-leave-it basis, without the possibility of negotiation; they benefit the typically economically stronger utility; and, as they are also drafted by the utility, it is fair to construe uncertain language against the utility whose imprecise draftsmanship has created the uncertainty.

Berry relies heavily on one case, *Waters v. Pacific Telephone Co.*, which declined to follow a rule of strict construction in connection with a liability-limiting clause in a tariff.[16] In *Waters* the California Supreme Court held that a liability-limiting clause in a tariff should be enforced in a negligence claim even though it did not specify that it applied to cases of negligence on the part of the utility. The court so held because the California Public Utilities Commission had adopted a policy of limiting the liability of telephone utilities for acts of ordinary negligence and relied on the validity of liability-limiting clauses in setting rates.[17] In addition, the court noted that subsequent to the events that led to the filing of the *Waters* case, the Public Utilities Commission issued a rule requiring telephone utilities to adopt a standard form limitation of liability provision in their tariffs.[18] No similar situation exists in Alaska.

Berry does not argue that the RCA has adopted a policy of limiting the liability of utilities for acts of negligence or, more pertinent to the present case, limiting the liability of entities that contract with utilities. Further, unlike the California commission, the RCA now requires that utilities publish in online tariffs a statement that any limitation of liability clause does not prevent a court from "determining the validity of the limitation of liability provision, or of any exculpatory clause, under applicable law."[19] The RCA thus, far from approving and requiring the inclusion of limitation of liability clauses as in *Waters*, has recognized that limitation of liability provisions and exculpatory clauses included in tariffs might not be valid or enforceable and that questions concerning their validity are subject to judicial determination.[20]

Berry's reliance on the fact that in *Locker* this court noted that we would treat the utility's contract publisher of the Yellow Pages directory the same as the utility does

construed strictly against its author...."); *Krasner v. N.Y. State Elec. & Gas Corp.*, 90 A.D.2d 921, 457 N.Y.S.2d 927, 929 (1982) ("[T]ariffs of a public utility are considered as part of the contract between the customer and the utility.... The tariff attempts to limit defendant's liability for its own negligence and such exculpatory clauses are strictly construed against the party seeking exemption from liability. Such strict construction is even more necessary in view of defendant's superior bargaining position.") (citations omitted); *Josephson v. Mountain Bell*, 576 P.2d 850, 852 (Utah 1978) ("[Tariffs] should be construed strictly against the utility....").

16. 12 Cal.3d 1, 114 Cal.Rptr. 753, 523 P.2d 1161 (1974).

17. *Id.* at 754, 759, 523 P.2d at 1162, 1167.

18. *Id.* at 757–58, 523 P.2d at 1165–66.

19. 3 Alaska Administrative Code (AAC) 52.367(c)(6) provides:

(c) A registered entity's online tariff must include a table of contents and a section for setting out notices of any proposed tariff revisions, and must set out in plain language a statement of the following:

...

(6) a statement that any limitation of liability provision in the online tariff is subject to the following:

(A) a registered entity may not disclaim liability for its own gross negligence or willful misconduct;

(B) inclusion of a limitation of liability provision in a registered entity's online tariff does not prevent a court of competent jurisdiction from

(i) determining the validity of the limitation of liability provision, or of any exculpatory clause, under applicable law; or

(ii) adjudicating negligence and consequential damage claims.

20. Although 3 AAC 52.367 did not become effective until 2003 and the acts giving rise to the present case took place in late 2001 and 2002, the regulation is evidence that the RCA has not adopted a policy holding that liability-limiting or exculpatory clauses are either essential or necessarily valid.

not mean that the tariff in this case protects Berry. In *Locker* the tariff in question was similar to that in this case. It provided that there would be no liability to the utility arising from errors in its directories except for charge listings and in charge listings its liability should be limited to a refund of the monthly rate paid. The error complained of in *Locker* was an error in the Yellow Pages, a charge listing. We decided, despite the language of the tariff, that the tariff did not apply to the Yellow Pages because the RCA lacked the power to "regulate classified advertisements." [21] The tariff therefore did not apply to protect either the utility or the directory publisher. We had no occasion to decide the question presented here, which is, assuming that the tariff protects the utility, does it also protect the publisher with which the utility contracts. *Locker* thus is not helpful to Berry's position.

Berry's argument that the tariff should apply to it because otherwise telephone rates will increase resembles an argument that was made and rejected in *Locker.* There the utility argued that the limited liability clause should be considered part of its tariff "because such limitation directly affects the rates it charges. Without such a limitation, it asserts, the overall rates for its service might increase. Therefore, [the utility] reasons, the [RCA] properly accepted the tariff limiting Yellow Pages liability under its authority to regulate overall rates." [22] We did not take issue with the proposition that not applying the clause could have an effect on the utility's revenues and costs and thus influence rates. But we held that any such effect was not in itself sufficient to require application of the tariff to Yellow Pages advertising: "A mere tangential effect upon overall rates will not suffice to limit categorically [the utility's] liability for negligence." [23]

██ Here, similarly, imposing liability on Berry for negligent mistakes made in publishing a directory might ultimately mean that it is more costly or less profitable for ACS to issue telephone directories. But this is only a possibility. Under the existing contract between ACS and Berry the risk of publishing errors is allocated to Berry, and Berry is required to carry liability insurance to guard against such errors. ACS and Berry have therefore already taken steps to guard against liability for publishing errors. They have presumably also already absorbed the costs associated with these steps. The possibility that there will be increased costs to ACS resulting from not applying the tariff to Berry that will ultimately affect rates seems here to be not only tangential, as in *Locker,* but distinctly speculative.

For these reasons we conclude that a rule of strict construction should be employed to construe the exculpatory tariff. When such a rule is employed it is clear that the exculpatory tariff does not protect Berry. As already noted, Berry is not mentioned either by name or by description in the tariff. With reference to Berry, therefore, the tariff is not an instrument in which "the intent to release a party from liability for future negligence" is "conspicuously and unequivocally expressed." [24]

## Other Issues

██ Because as the case now stands Berry is not the prevailing party, the award of attorney's fees and costs must be vacated.

██ Uncle Joe's has waived the right to appeal the superior court's refusal to compel production of attorney-client communications. Parties generally cannot appeal stipulated judgments.[25] In a civil case, at most, a

---

21. *Locker,* 723 P.2d at 1264.

22. *Id.*

23. *Id.*

24. *Moore v. Hartley Motors, Inc.,* 36 P.3d 628, 633 (Alaska 2001) (quoting *Kissick v. Schmierer,* 816 P.2d 188, 191 (Alaska 1991)). Further, the tariff does not explicitly disclaim liability due to negligence, either of ACS or other entities, as

required by our case law. *See Moore,* 36 P.3d at 633; *Kissick,* 816 P.2d at 191.

25. *See, e.g., Legge v. Greig,* 880 P.2d 606, 607–09 (Alaska 1994) (no right to appeal from voluntary dismissal following an adverse ruling where neither the opposing party nor the superior court agreed to appealability); *Singh v. State Farm Mut. Auto. Ins. Co.,* 860 P.2d 1193, 1197 (Alaska 1993) ("[A] right to appeal is waived by stipulating to judgment.").

party may appeal from a stipulated judgment where the stipulation expressly reserves an issue for appeal.[26] The stipulated judgment here reserves the right to appeal only the April 22, 2004 summary judgment order, not the April 26, 2004 denial of the motion to compel. Without an indication that the parties intended to reserve the right to appeal this order, this court will not consider it.

█ Berry's contention that the court erred in refusing to enforce the Yellow Pages liability limitation clause is moot. A case is moot if the party bringing the action would not be entitled to any relief even if it prevailed.[27] If Berry prevailed on this claim, it would still be liable under its contract with Uncle Joe's for the cost of the ads. The nominal damages awarded Uncle Joe's by stipulation, $10, are less than the amount Uncle Joe's paid Berry for the ad. Therefore, even if the limitation of liability clause were valid the award to Uncle Joe's would be sustained and Berry would be entitled to no relief.

### Conclusion

For the reasons stated, the judgment of the superior court dismissing Uncle Joe's claim with respect to the error in the White Pages is REVERSED and the award of costs and attorney's fees to Berry is VACATED. The judgment awarding Uncle Joe's nominal damages for an error in the Yellow Pages is AFFIRMED. This case is REMANDED to the superior court for further proceedings consistent with this opinion.

**26.** *Legge,* 880 P.2d at 608–09; *cf. Pratt & Whitney Can., Inc. v. Sheehan,* 852 P.2d 1173, 1174–75 (Alaska 1993) (considering on appeal, without discussing appealability, a strict liability claim that Pratt had not contested in a stipulated judgment where Pratt expressly reserved the right to appeal this claim); *City of Kenai v. Kenai Peninsula Newspapers, Inc.,* 642 P.2d 1316 (Alaska 1982) (allowing, without discussing appealability, appeal of a stipulated preliminary injunction that the parties expressly reserved for appeal).

**27.** *O'Callaghan v. State,* 920 P.2d 1387, 1388 (Alaska 1996) (citing *Maynard v. State Farm Mut. Auto. Ins. Co.,* 902 P.2d 1328, 1329 n. 2 (Alaska 1995)).