474 So.2d 275 (1985)
Mildred Louise VENDOLA and Joseph Vendola, As Personal Representatives of the Estate of Joseph S. Vendola, Jr., Deceased, Appellants,
v.
SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Appellee.
Nos. 83-2766, 84-488.
District Court of Appeal of Florida, Fourth District.
June 26, 1985.
Rehearing Granted September 11, 1985.
*276 Joel D. Eaton of Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Miami, and Sheldon J. Schlesinger, P.A., Fort Lauderdale, for appellants.
John R. Hargrove of McCune, Hiaasen, Crum, Ferris & Gardner, P.A., Fort Lauderdale, for appellee.
YAWN, THERON A., Jr., Associate Judge.
This is a wrongful death action by appellants as personal representatives of the estate of their deceased son. They challenge an adverse jury verdict and seek reversal of an order denying their motion for a new trial and a judgment taxing costs against them individually.
We attempt to dispel the confusion generated by two defenses, more accurately characterized as non-defenses, interposed by Southern Bell Telephone and Telegraph Company (Southern Bell), appellee and defendant below, between it and the charge of negligence leveled by appellants. One has been referred to as the "tariff defense"; the other as the "suicide defense." Neither is relevant to the case. Their irrelevance notwithstanding, defense counsel devoted the major portion of his final argument to discussing, analyzing and presenting them to the jury as reasons for acquitting Southern Bell of the charge of negligence. The jury obliged. We do not impute impurity to Southern Bell's motives for asserting these defenses but their lack of support in law or fact becomes obvious upon close examination. We begin that examination with a review of the relevant evidence.
On Sunday, July 8, 1979, 19 year old Joseph Vendola, Jr., (Vendola) lay on the floor of his brother's bedroom wounded in the abdomen by a gunshot of undetermined origin. At 12:23 P.M. he dialed the Broward County Sheriff's Office on the emergency number, 911, and uttered the words "Ambulance. Quick." Unable to say more, he lay moaning into the receiver of the uncradled telephone until his death, shortly before 2:10 P.M. The Sheriff's Office immediately telephoned Southern Bell requesting that the call be traced to ascertain its origin and provide an address to *277 which aid could be dispatched. Standard, detailed, and often used procedures had been established to implement the 911 service which Southern Bell had contracted to provide Broward County under the "Florida Emergency Telephone Act," section 365.171, Florida Statutes (1983). They were attempted, but this time they didn't work.
The Sheriff's request was followed by an incredible succession of blunders by Southern Bell spanning almost two hours before the call was correctly traced and the proper address provided. By then Vendola's girlfriend had discovered him and provided the Sheriff's Office with the correct address over the still open telephone line. Paramedics arrived within minutes after being dispatched. Vendola was dead.
It was appellants' position that Southern Bell's negligent failure to correctly trace the call denied their son the treatment necessary to save his life and was therefore the proximate cause of his death.
Expert, although disputed, testimony was presented at trial to the effect that Vendola's life was salvageable had he received medical treatment within the hour immediately following the shooting, and perhaps longer.

TARIFF DEFENSE
The first defense was that the general subscribers tariff agreement between the Florida Public Service Commission and the state's telephone companies relieved it of any duty to Vendola.
The trial court admitted the tariff in evidence over appellants' objections, denied their motion for directed verdict on the tariff defense, refused appellants' request to instruct the jury that Southern Bell owed Vendola a duty to exercise reasonable care as a matter of law, and submitted to the jury the question of whether Southern Bell owed any legal duty to Vendola. Each of these rulings was error.
The applicable provision of the tariff is as follows:
This service is offered solely as an aid in handling assistance calls in connection with fire, police, and other emergencies and does not create any relationship or obligation, direct or indirect, to any person other than the customer contracting for 911 service. In the event of any interruption of the service, the Telephone Company shall not be liable to any person, corporation or other entity for any loss or damage in an amount greater than an amount equal to the pro rata allowance of the tariff rate for the service of facilities provided to the customer for the time such interruption continues, after notice to the Telephone Company. No allowance shall be made if the interruption is due to the negligence or willful act of the customer of the service. Further, each customer agrees to release, indemnify, defend and hold harmless the Telephone Company from any and all loss, claims, demands, suits or other action, or any liability whatsoever, whether suffered, made, instituted or asserted by the Customer or by any other party or person, for any person injury to or death of any person or persons, or for any loss, damage or destruction of any property, whether owned by the Customer or others, or for any infringement or invasion of the right of privacy of any person or persons, caused or claimed to have been caused, directly or indirectly, by the installation, operation, failure to operate, maintenance, removal, presence, condition, location or use of "911" service features and the equipment associated therewith, or by any services which are or may be furnished by the Telephone Company in connection therewith, including but not limited to the identification of the telephone number, address or name associated with the telephone used by the party or parties accessing "911" service hereunder, and which arise out of the negligence or other wrongful act of the Telephone Company, the Customer, its user agencies or municipalities or employees or agents of any one of them. (Section A 24.1.2g General Subscribers *278 Service Tariff Emergency Reporting Service). (The underlining is not supplied for emphasis but to facilitate identification of the tariff's three parts.)
In our view, reliance upon the tariff as an exculpatory shield from tort liability is misplaced and the arguments imputing that effect to it completely miss the point. Analysis reveals that it is divisible into three distinct parts, each having a different objective, none of which is the exoneration of Southern Bell from liability for its torts.
The first is a statement of the purpose for which the 911 emergency service is offered and disclaims the creation of any relationship or obligation to any person other than the customer  in this case Broward County.
The middle part is a limitation upon damages collectible by the customer caused by any interruption of service.
The last part, and most significant, is an agreement by the customer to indemnify and hold harmless the telephone company from all liability whatsoever to any other person in an exhaustive assortment of circumstances, including, but by no means limited to, the death of another caused by the telephone company's negligence. This transfer to the customer of ultimate liability is in itself a tacit recognition of the company's amenability for its torts.
In final argument, Southern Bell's counsel, not the Court, took it upon himself to instruct the jury that "The general services tariff ... has the force and effect of law between these parties for services arising thereunder." This is a correct statement of law in those cases to which it is applicable. Carter v. American Telephone & Telegraph Company, 365 F.2d 486 (5th Cir.1966), cert. denied, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); American Telephone & Telegraph Company v. Florida-Texas Freight, Inc., 357 F. Supp. 977 (S.D.Fla. 1973); Maddalena v. Southern Bell Telephone & Telegraph Company, 382 So.2d 1246 (Fla. 4th DCA 1980); Wilkinson v. New England Telephone & Telegraph Company, 97 N.E.2d 413 (Mass. 1951); Warner v. Southwestern Bell Telephone Company, 428 S.W.2d 596 (Mo. 1968); Russ v. Western Union Telephone Company, 222 N.C. 504, 23 S.E.2d 681 (N.C. 1943). But it does not apply to this case: it is patently non-exculpatory and its "force" is limited to the relations between the company and its customer and does not extend to any common law duty which Southern Bell may have owed to Vendola. Inherent in Southern Bell's position is the unarticulated hypothesis that the Public Services Commission is empowered to contract with the state's telephone companies to relieve them of accountability for tortious conduct toward one not privy to the contract. We know of no such power and neither party has cited us to any.
The tariff will not yield to the construction contended for by Southern Bell. Viewed in this light, any illusion of relevance vanishes and with it the basis for its admission into evidence and the instruction that the jury determine whether "Southern Bell and Telegraph Company owed any legal duty to Joseph Vendola, Jr."
Southern Bell's counsel correctly predicted in his opening statement that:
The evidence will be that nowhere in this tariff having to do with the 911 system or otherwise, is there any requirement or legal obligation or contractual undertaking that Southern Bell would trace calls or attempt to do so.
... Southern Bell had always tried to do this. Attempted, when it was possible, for governmental agencies... .
When it undertook the service of tracing these calls, Southern Bell exposed itself to that venerable principle of law that an action undertaken for the benefit of another, even gratuitously, must be performed in accordance with an obligation to exercise reasonable care. Barfield v. Langley, 432 So.2d 748 (Fla. 2d DCA 1980).
As long ago as 1909 our Supreme Court held that where a water company undertakes to render the public service of furnishing water for fire protection in a city, an individual may maintain an action against the company for damages for a *279 loss proximately resulting to him from the negligent failure to perform its duty to the plaintiff as a part of the public service undertaken, if the loss is such as the company should reasonably have contemplated as the ordinary, natural, and probable results of the negligence. Woodbury v. Tampa Waterworks Co., 57 Fla. 243, 49 So. 556 (1909).
Here, as in Woodbury, Southern Bell undertook the rendition of a public service thereby assuming the duty to exercise reasonable care in the discharge of that undertaking. Whether it breached that duty was a question of fact for resolution by the jury under proper instructions. Where such a duty exists as a matter of law it is error to refuse to instruct the jury agreeably with Instruction 3.1(a), Florida Standard Jury Instructions. Miami Paper Co. v. Johnston, 58 So.2d 869, 871 (Fla. 1952); Bradley v. Guy, 438 So.2d 854 (Fla. 5th DCA 1983); City of Tamarac v. Garchar, 398 So.2d 889 (Fla. 4th DCA 1981); Jackson v. Reardon, 392 So.2d 956 (Fla. 4th DCA 1980). The Appellants were entitled to that instruction and the court erred by not giving it.[1]

SUICIDE DEFENSE
We next visit the defense citing suicide as the proximate cause of Vendola's death.
In the first place, that defense is foreclosed by the well-settled law of the state applied to the evidence before us. Vendola's shooting was merely a remote condition or conduct which only furnished the occasion for the subsequent and supervening negligence of Southern Bell and was not the proximate cause of the result of that subsequent negligence. McClain v. McDermott, 232 So.2d 161 (Fla. 1970); Pinkerton-Hays Lumber Co. v. Pope, 127 So.2d 441 (Fla. 1961); Bessett v. Hackett, 66 So.2d 694 (Fla. 1953); Tampa Electric Co. v. Jones, 138 Fla. 746, 190 So. 26 (1939); Seaboard Air Line Ry. v. Mullin, 70 Fla. 450, 70 So. 467 (1915); Piper v. Moore, 410 So.2d 646 (Fla. 3d DCA 1982); Whitehead v. Linkous, 404 So.2d 377 (Fla. 1st DCA 1981); Matthews v. Williford, 318 So.2d 480 (Fla. 2d DCA 1975); Sims v. Apperson Chemicals, Inc., 185 So.2d 179 (Fla. 1st DCA 1966); Atlantic Coast Line Railroad v. Ponds, 156 So.2d 781 (Fla. 1st DCA 1963); Kuhn v. Telford, 115 So.2d 36 (Fla. 2d DCA 1959); McWhorter v. Curby, 113 So.2d 566 (Fla. 2d DCA 1959).
If Vendola's death would not have occurred but for the supervening negligent acts or omissions of Southern Bell, those acts and omissions must be deemed the cause of his death, Whitehead, supra.
In the second place there was no evidence of suicide even if it had been an available defense in the first place. We do not know whether the bullet was accidentally or intentionally inflicted, or whether by Vendola's own hand or that of another. Its source remains a mystery susceptible only to conjecture and speculation and is entirely immaterial. Evidence directed at it is irrelevant and inadmissible and the comparative negligence instruction was improper under Whitehead.
The mischief caused by the injection of the suicide defense was compounded further when Southern Bell effectively abandoned it in final argument with the announcement to the jury by its counsel,
"Now, I want to clear up something. Southern Bell and I are not claiming this young man committed suicide." He later added, "I wanted to show motive for self-infliction, not suicide. I don't believe that that's what ultimately Joey Vendola intended to do. I'm not even sure the evidence really stands for the proposition of suicide."
With this admission, to what did the mountain of evidence by which Southern Bell had initially hoped to prove suicide *280 relate? Nothing! Further evidence of it was foreclosed.
However, Southern Bell had theorized that Vendola was motivated to suicide by a single pending drug charge, delivery of one ounce of cocaine  a second degree felony, in which he was scheduled to appear in court for a status conference on the day following his death.
In support of this theory Southern Bell placed in evidence, over appellants' objections, a certified copy of a court file containing material relating, but not limited, to the pending felony charge. Additionally, it referred to other drug offenses for which Vendola had been arrested but not charged, as well as to three other individuals allegedly involved in these activities.
That portion of the file concerned with the pending charge may have been admissible as evidence of motive under New York Life Insurance Co. v. Satcher, 152 Fla. 411, 12 So.2d 108 (1943), but the material relating to the uncharged offenses was not. Without probative value, its sole effect was to encourage the jury to conjure up visions of a depraved young man heavily involved in the drug traffic and was therefore highly prejudicial.
Evidence of a motive for suicide is admissible to overcome the rule of law that an unexplained death by violence requires the conclusion that it was not self-imposed until credible evidence of suicide is offered. When Southern Bell came forward with its plea of suicide it assumed the burden of proving it beyond a reasonable doubt to the exclusion of every other reasonable hypothesis of death. New York Life Insurance Co. v. Satcher, supra; Weinstock v. Prudential Insurance Company of America, 247 So.2d 503 (Fla. 3d DCA 1971). The evidence here did not come within shouting distance of that standard.
Any spark of life left in the suicide defense after exposure to Whitehead was completely extinguished by abandonment. Nothing was left to which it could relate and the issue was moot. The voluminous evidence and argument concerning suicide and motive for suicide was stripped of purpose except for its prejudicial effect and tendency to persuade the jury of its legitimacy as a defense.
This defense was combined with the tariff defense, enshrouded in a facade of rhetoric concealing their lack of substance, and presented to the court and jury doing nothing more than befog the issues, confuse, and sow the seeds of prejudice in the minds of the jury. Every litigant is entitled to nothing less than the cold neutrality of an impartial jury. The appellants were denied that right.

TAXATION OF COSTS
We adopt the reasoning of our sister court in Johnson v. Schneegold, 419 So.2d 684 (Fla. 2d DCA 1982), and reverse the judgment taxing costs against appellants personally.
REVERSED AND REMANDED FOR A NEW TRIAL.
LETTS and DELL, JJ., concur.
NOTES
[1] When requested by local government authorities, and subject to the availability of facilities, the Telephone Company will provide a universal number "911" for use of Public Safety Answering Points (PSAPs) engaged in assisting local governments in the protection and safety of the general public (Section A24.1.1 General Subscribers Service Tariff).