723 A.2d 454

**MARRIOTT CORPORATION**

**v.**

**The CHESAPEAKE & POTOMAC TELEPHONE COMPANY OF MARYLAND.**

**No. 1749, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Dec. 30, 1998.

Reconsideration Denied March 2, 1999.

Paul T. Glasgow (Venable, Baetjer & Howard, on the brief), Rockville; Henry J. Catenacci (Marianne C. Tolomeo and Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, on the brief), Newark, NJ, for Appellant.

Albert D. Brault (Brault, Graham, Scott & Brault, LLC, on the brief), Rockville, for Appellees.

Argued before MOYLAN, KENNEY, and RALPH M. BURNETT (Specially Assigned), JJ.

RALPH M. BURNETT, Judge, Specially Assigned.

This appeal involves a multi-million dollar law suit based on four hours of lost long distance telephone service. The appellant is the Marriott Corporation ("Marriott"). The appellee is the Chesapeake and Potomac Telephone Company of Maryland[1] ("C & P") which, along with various co-defendants[2], was sued by Marriott for negligence and gross negligence in connection with the lost service.

Marriott is a well known owner and operator of hotels throughout the world. Reservations for its hotels are pro-

---

**1.** Appellee acknowledges that after the complaint was filed it "changed names and is now known as Bell Atlantic—Maryland, Inc." We shall follow the lead of the parties and, despite the name change, shall refer to the appellee as "C & P" throughout this opinion.

**2.** The co-defendants were: the State of Maryland, Brandenberg Electric, Inc., Miss Utility, Inc., One Call Concepts, Inc., and Byers Engineering Company. Various cross-claims were filed between the co-defendants. Although the parties supply us with no firm explanation of what happened, it appears that the claims against Miss Utility, Inc., One Call Concepts, Inc. and Byers Engineering Company were dismissed or otherwise resolved at some point early in the case. As shall be discussed in more detail *infra*, Brandenberg Electric, Inc. and the State were dismissed without prejudice just before this appeal was noted.

cessed at the Frederick Computer Data Center located in Frederick, Maryland. This center provides information as to the status of reservations and room availability at the Marriott hotels to travel agents and customers seeking reservations at Marriott hotels. All long distance communications with the Frederick Center via telephone and data communication services are provided by the American Telephone and Telegraph Company ("AT & T") under written contract between AT & T and Marriott. AT & T bills Marriott and Marriott pays AT & T for these services. The services are provided to Marriott via a fiber optic cable installed and maintained by C & P. Marriott is not a party to any agreement regarding this cable.

On Friday, April 7, 1989, the fiber optic cable was severed by a Brandenberg Electric, Inc. crew that had been hired by the State Highway Administration ("SHA") to drill holes for the placement of new road signs along State Highway 874. The result was a four-hour interruption of long distance telephone service throughout western Maryland. SHA had given notice of the sign location operation to Miss Utility[3], which in turn had given notice to C & P. Thereafter, C & P employee Robert Carwithen had marked the supposed location of the underground cable with a painted, dashed line. Through its own investigation, C & P determined that the "C & P locator did not mark the cables correctly," concluding that its own locator, Carwithen, was at fault.

Marriott filed a complaint in the Circuit Court for Montgomery County against C & P alleging negligence and gross negligence.[4] Marriott claimed damages stemming from the loss of service occasioned by the severance of the fiber optic cable. C & P moved for summary judgment, arguing that its liability for negligence and gross negligence, if any, was limited by General Regulation Tariff P.S.C. [Public Service

---

**3.** *See* Md. Pub. Util. Co.Code Ann. §§ 12–1–1—12–113 (1998) (setting forth laws regarding excavation or demolition near underground public utility facilities).

**4.** Marriott also claimed negligence against all of the other co-defendants and gross negligence against some of the other co-defendants.

Commission] Md. No. 201 ("the Tariff" or "Tariff No. 201"), on file with the Maryland Public Service Commission. Under certain circumstances, the Tariff limits C & P's liability to "an amount equivalent to the proportionate charge to the customer for the service or facilities affected." C & P also argued that it was entitled to summary judgment as to gross negligence because, as a matter of law, Marriott was unable to allege facts sufficient to constitute gross negligence. Marriott responded by arguing that the Tariff was not applicable to C & P's liability to Marriott for interruption of the long distance service because Marriott was AT & T's customer and not C & P's. Marriott added that summary judgment should not be granted as to gross negligence because (i) a party cannot exculpate itself from gross negligence, and (ii) the claim was supported by sufficient facts. After oral argument, the trial court granted partial summary judgment in C & P's favor, finding that Marriott was C & P's customer in regard to the affected service "by virtue of the use of C & P's lines in delivering AT & T's calls." The court concluded that any liability on C & P's part on the negligence claim was limited by the Tariff. The court also ruled that Marriott had failed to set forth "facts to support a claim of gross negligence."

Marriott moved under Md. Rule 2–602(b) to have the ruling on the motion for summary judgment certified as a final judgment. It argued that, under the ruling, it could not recover *any* damages from C & P. The trial court agreed and granted the motion over C & P's objection. In apparent contradiction to its earlier ruling on the motion for summary judgment to the effect that Marriott was C & P's customer in regard to the affected service, the court explained that "[t]he only service provided to Marriott by C & P was local telephone service," and "[t]he service allegedly interrupted for four hours was AT & T's long distance service . . . ."

Marriott then noted an appeal, but this Court granted C & P's motion to dismiss in light of the many remaining claims and cross-claims involving Brandenberg Electric, Inc. and the State. Thereafter, Marriott moved to dismiss Brandenberg Electric, Inc. and the State from the case and to re-enter the

summary judgment as final. The trial court granted the motion and Marriott filed the instant appeal.[5] C & P noted a cross-appeal.

## ISSUES

Marriott presents several questions on appeal, which we consolidate and rephrase as follows:

— Was Marriott a C & P customer, such that C & P's liability for negligence was limited under General Regulation Tariff No. 201?

— Did the trial court err in holding that there were no facts to support the claim for gross negligence?

C & P adds the following question in its cross-appeal:

— Did the trial court err in granting Marriott's motion for entry of final judgment?

We shall first address the issue raised by C & P in its cross-appeal.

## DISCUSSION

### I

### Finality of Judgment

C & P argues that the trial court erred by purporting to enter a final judgment without first having made a determination as to whether C & P was negligent and, if so, what limited damages could be assessed against it under the Tariff. The applicable portion of the Tariff reads:

E. LIABILITY OF THE TELEPHONE COMPANY

In view of the fact that the customer has exclusive control over the use of service and facilities furnished by the Telephone Company, and because of unavoidableness of errors incident to the services and to the use of such

---

5. Unlike the final judgment entered by the trial court in response to Marriott's first motion to enter final judgment, the second final judgment was not entered pursuant to Md. Rule 2–602(b). Rather, it was entered pursuant to Rule 2–601.

facilities of the Telephone Company, services and facilities are furnished by the Telephone Company subject to the terms, conditions and limitations herein specified:

1. Service Irregularities

The liability of the Telephone Company for damages arising out of mistakes, omissions, interruptions, delays, errors or defects in transmission, or failures or defects in facilities furnished by the Telephone Company, occurring in the course of furnishing service or other facilities and not caused by the negligence of the customer, shall in no event exceed an amount equivalent to the proportionate charge to the customer for the service or facilities affected during the period such mistake, omission, interruption, delay, error or defect in transmission, or failure or defect in facilities continues after notice and demand to the Telephone Company.

General Regulations Tariff P.S.C. Md. No. 201, Section 1, Subsection E at 4th Revised Page 7 (effective January 1, 1984). C & P argues that the mere dismissal of all defendants other than C & P, making the case a two-party lawsuit, does not bring the matter to final judgment. Instead, C & P claims that the issue of C & P's liability remains unadjudicated, the lower court having merely limited C & P's liability and thereby the amount of damages Marriott may be able to recover.

To the contrary, the lower court concluded that *no damages* could be assessed against C & P and therefore Marriott could not go forward. At the hearing on Marriott's first motion for entry of final judgment, the court reflected on the effect of Marriott's position that no damages would be determined:

... [I]f in fact there are no damages that can be recovered by the plaintiff against C & P, then in the Court's opinion ... the plaintiff would have no case against C & P because of the three elements of duty, breach, and a necessary ability to prove damages.

If because of the application of the tariff the plaintiff can recover no damages, it is the court's inclination to certify

this case, but it seems to me that I am not really at that position.

If counsel wants to file an affidavit to the [e]ffect that the[re] are no damages in this case, if C & P wants to file a counter affidavit, then I think perhaps the Court could rule then on the question of the entire claim of Marriott against C & P on the question of damages one way or another.

If there is a possibility of [Marriott] getting damages even though they might be minimal under the tariff, then I don't think I can certify the case.

On the other hand I think if there is no possibility that Marriott could get damages on its claim against C & P because of the tariff situation, then I will certify it.

In response, Marriott provided the court with two affidavits—one signed by its attorney and one signed by a high-level employee. Both affiants stated that Marriott did not obtain long distance service from C & P and that only long distance service was interrupted. C & P's attorney filed his own affidavit, to which he attached the deposition testimony of a C & P employee. During the deposition, the employee had acknowledged that C & P did not provide Marriott's long distance service and did not bill Marriott for such services. The employee had vaguely suggested that C & P nevertheless billed Marriott in connection its use of the fiber optic cable. The trial court thus issued an order in which it concluded that the undisputed evidence established:

The only service provided to Marriott by C & P was local telephone service. The service allegedly interrupted was four hours of AT & T's long distance service to Marriott. Since Marriott's local telephone service was not interrupted, the application of C & P's tariff precludes Marriott from obtaining any damages against C & P. In fact, Marriott has filed an affidavit that if, as this Court has ruled, the tariff applies to this case, it cannot recover any damages against C & P. Since Marriott cannot recover damages against C & P, it has no cause of action.

In the same order, the court entered final judgment in favor of C & P. The court reiterated the reasons for entering final judgment when it issued its second order in response to Marriott's second motion for entry of final judgment.

■■■■ The Court of Appeals "has repeatedly held that an order 'having the effect of terminating the case in the circuit court[ ] is a final judgment.'" *Ferrell v. Benson*, 352 Md. 2, 5, 720 A.2d 583 (1998) (citation omitted). "[A] trial court's order sometimes may constitute a final appealable judgment even though the order fails to settle the underlying dispute between the parties. Where a trial court's order has 'the effect of putting the parties out of court, [it] is a final appealable order.'" *Horsey v. Horsey*, 329 Md. 392, 401, 620 A.2d 305 (1993) (citation omitted). As the Court of Appeals has explained:

> The determination of whether a court has rendered judgment turns on whether the court indicated clearly that it had fully adjudicated the issue submitted and had reached a final decision on the matter at that time. In other words, the trial court's ruling must be "an unqualified, final disposition of the matter in controversy." ... There are, however, no formal requirements regarding the rendition of a judgment. ... As one court has observed, "[t]here are no hard and fast rules for determining what is a judgment." ... Rather, whether a judgment has been rendered in a particular case is an inquiry that must be made on a case-by-case basis which focuses upon the actions and statements of the court.

*Davis v. Davis*, 335 Md. 699, 710–11, 646 A.2d 365 (1994) (citations omitted).

The trial court made it abundantly clear that its ruling on C & P's motion for summary judgment was a final judgment. The court specified that the undisputed evidence established that Marriott was not C & P's customer for long distance service, and that the only damages claimed by Marriott arose from the loss of long distance service. In light of the court's finding that the Tariff applied, and because the Tariff express-

ly limited recovery to "an amount equivalent to the proportionate charge to the customer for the service or facilities affected," the court correctly concluded that Marriott could not recover. We are thus satisfied that the court's ruling on the motion for summary judgment put Marriott out of court and was indeed a final judgment.

## II

## Marriott as C & P's Customer

By its express language, Tariff No. 201 applies to Marriott only if Marriott was a customer of C & P with respect to the "service or facilities affected." General Regulations Tariff P.S.C. Md. No. 201, Section 1, Subsection E.1 at 4th Revised Page 7 (effective January 1, 1984). The trial court determined, on summary judgment, that Marriott was a C & P customer "by virtue of the use of C & P's lines in delivering AT & T's calls." It concluded that Marriott's negligence claim was therefore subject to the limitation on damages set forth in the Tariff. Marriott now contends that the trial court erred in determining that it was a C & P customer.

A trial court "shall enter summary judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e). In considering a motion for summary judgment, "a trial court determines issues of law; it makes rulings as a matter of law, resolving no disputed issues of fact." *Beatty v. Trailmaster*, 330 Md. 726, 737, 625 A.2d 1005 (1993). "In reviewing a disposition by summary judgment, an appellate court resolves all inferences against the party making the motion.... Because a trial court decides issues of law when granting a summary judgment, the standard of appellate review is whether the trial court was legally correct...." *Southland Corp. v. Griffith*, 332 Md. 704, 712, 633 A.2d 84 (1993) (citations omitted). *See also Dobbins v. Washington Suburban Sani-*

*tary Comm'n,* 338 Md. 341, 344–45, 658 A.2d 675 (1995); *Berkey v. Delia,* 287 Md. 302, 304–05, 413 A.2d 170 (1980).

There is no definition of "customer" in the Public Service Commission Law. *See generally* Md. Ann.Code art. 78 (1995 Repl.Vol., 1997 Cum.Supp.). Nor is there a definition in Tariff No. 201 itself. Subsection C of Section 1 of the Tariff, which concerns "Applications for Service," indicates, however, that "[u]pon the acceptance of an application for service, all the applicable provisions in the Telephone Company's tariffs lawfully on file become the contract between the customer and Telephone Company." General Regulations Tariff P.S.C. Md. No. 201, Section 1, Subsection C.1 at Original Page 1b (effective January 1, 1984). This suggests that an applicant for service becomes a customer when its application is accepted. There is no indication that Marriott submitted an application to C & P in connection with the fiber optic cable or that any application was accepted.

An affidavit appended to Marriott's opposition to C & P's motion for summary judgment indicates that the telecommunications for Marriott's reservation center were provided by AT & T, billed to Marriott, and paid by Marriott to AT & T. Mason Clinton, Senior Director of Telecommunications for Marriott, stated in his affidavit that Marriott's contract for the interrupted service was with AT & T and that Marriott had no agreement with C & P regarding the service and received no bills from C & P. Thus, competent evidence before the trial court when it ruled on the motion for summary judgment suggested that Marriott was no more than a third party or "down-the-line" user of services and facilities provided to AT & T by C & P.[6]

---

6. Marriott filed the affirmation of Kelsey Hill, its Vice President of Telecommunications and Technology Advancement, in support of its first motion to enter final judgment in the case. Hill corroborated Clinton's assertion that Marriott paid nothing to C & P in connection with its long distance service. She also stated that Marriott's local service and long distance service were provided on different cables. In contrast, C & P provided the court with the deposition testimony of corporate designee Gregory Miller, to the effect that (i) AT & T's long

■ "A company's filed tariff has the force of law, and is binding between a company and its customers . . . and is part of the contract between the company and its customers." 86 C.J.S. *Telecommunications* § 73 at 76–77 (1997). In *Transportation Data Interchange, Inc. v. AT & T Corp.*, 920 F.Supp. 86 (D.Md.1996), the plaintiff sued AT & T for charging it the tariff rate rather than the rate it had privately negotiated. AT & T moved for summary judgment and the motion was granted. The court explained that "[t]ariffs filed with the FCC conclusively and exclusively control the rights and liabilities between the parties." *Id.* at 88.

■ In the event of an ambiguity, a tariff, like any other contract, must be strictly construed against the drafting party. *See generally King v. Bankerd,* 303 Md. 98, 106, 492 A.2d 608 (1985) (setting forth general rule for construing contract against drafter in event of ambiguity); *LaSalle Machine Tool, Inc. v. Maher Terminals, Inc.,* 452 F.Supp. 217, 221 (D.Md. 1978) (applying general rule to contract involving tariff), *aff'd,* 611 F.2d 56 (4th Cir.1979). In general, courts will not read limitations of liability provisions to cover situations beyond their express terms. *See Blue Bird Cab Co., Inc. v. Amalgamated Casualty Ins. Co.,* 109 Md.App. 378, 385, 675 A.2d 122 (1996) (explaining that any ambiguity as to the breadth of limitation clause in insurance policy will be construed against insurer). *See also Birney v. New York & Washington Printing Tel. Co.,* 18 Md. 341, 358–59 (1862) (regarding limitation of liability in telegraph company tariff). Thus, the rules of construction require a narrow reading of the Tariff at issue.

■ The question, then, is whether a "down-the-line" user, such as Marriott may have been, can be considered a customer for the purposes of the Tariff. Although there is no reported

---

distance service necessarily utilizes C & P's local facilities, and (ii) C & P bills long distance callers for the use of the facilities, although it does not bill them for the long distance calls. While none of this evidence was before the trial court when it ruled on C & P's motion for summary judgment, it highlights at least two genuine disputes as to a material fact—whether Marriott's long distance service used C & P's local facilities and whether Marriott directly paid C & P for the use.

Maryland case on point, Marriott directs us to two persuasive cases from other jurisdictions.

In *Abel Holding Co., Inc. v. American District Tel. Co.,* 147 N.J.Super. 263, 371 A.2d 111 (N.J.Super.Ct.App.Div.1977) (*per curiam* ), the plaintiff, owner of the Steel Pier in Atlantic City, contracted with ADT, an alarm company, to install a fire alarm. ADT in turn contracted with the defendant telephone company to have the alarm linked to the local fire department. A fire occurred and the telephone company link failed. The plaintiff then sued the telephone company. The phone company defended on the basis that it was protected by a tariff, but the trial court rejected the argument because, *inter alia,* there was no indication in the tariff that it applied to third parties. The appellate court affirmed.

In *Vendola v. Southern Bell Tel. and Tel. Co.,* 474 So.2d 275 (Fla.Dist.Ct.App.1985), *cert. denied,* 486 So.2d 597 (Fla.1986), Broward County, Florida contracted with Southern Bell to provide a 911 service which included a call tracing system. A teenager who somehow suffered shotgun wounds called 911 but was unable to give his address, and the tracing system failed. The teenager died, and his parents brought suit against Southern Bell. A jury trial was held and Southern Bell prevailed. On appeal, the plaintiffs argued that the trial court erred when it refused to give a jury instruction that would have countered a closing argument made by Bell to the effect that Bell was protected by law by a tariff. The appellate court agreed that the court should have given the instruction and explained that the tariff referenced by Bell did not apply to third parties.

We are persuaded, as were the courts in *Abel Holding Co.* and *Vendola,* that a "down-the-line" user can not be subjected to the provisions of a tariff to which it is not a party. Reading Tariff No. 201 narrowly, as we must, we are convinced that the Tariff applies only to C & P's direct customers. In light of the evidence presented by Marriott that it was not C & P's direct customer for the affected service, the trial court erred

in determining on summary judgment that Marriott was C & P's customer.[7]

## III

### Gross Negligence

The trial court granted summary judgment in Marriott's gross negligence claim, explaining that "in the best possible scenario of facts in this case as set forth by the plaintiff . . . there are no facts to support a claim of gross negligence."[8]  Again, Marriott argues that the trial court

---

**7.** A factual determination upon remand that Marriott did pay C & P for the use of the fiber optic cable and was therefore C & P's direct customer would not end the inquiry as to whether the Tariff is applicable.  We agree with Marriott's assertion that, even if it were a customer in regard to the service affected, the court erred in determining on summary judgment that the service affected was governed by the Tariff.

Subsection A.1 of Section 1 of the Tariff specifies that the provisions of the Tariff "govern the furnishing of intrastate intraLATA communications services by [C & P]. . . ."  General Regulations Tariff P.S.C. Md. No. 201, Section 1, Subsection A.1 at 16th Revised Page 1 (effective January 1, 1984). *See generally Maryland People's Counsel v. Heintz,* 69 Md.App. 74, 77, 516 A.2d 599 (1986), *cert. denied,* 309 Md. 48, 522 A.2d 393 (1987) (defining "LATA" as a Local Access and Transport Area and explaining that, since the divestiture of AT & T, C & P is permitted to provide local telephone service within each LATA and is not permitted to provide inter-LATA, or long distance, service).  In short, the Tariff governs the furnishing of local communications services.

Beyond stating that it found Marriott to be C & P's customer, the trial court did not explain why it concluded that the Tariff governed the affected long-distance service.  C & P argues that the Tariff is applicable because Marriott's use of the fiber optic cable for long distance calls necessarily depended on C & P's local communications services or "connections."  C & P suggests that the trial court implicitly accepted this argument when it ruled that the Tariff applied.  C & P does not direct this Court to any evidence that was before the trial court, when it ruled on the summary judgment motion, that indicated that Marriott's long distance service was, in fact, dependent on C & P's local communications services.  No competent evidence precisely explained the relationship between AT & T, C & P, and the long distance and local communications services.  Thus, there were insufficient facts before the trial court for it to determine, on summary judgment, whether the affected long distance service was governed by the Tariff.

**8.** Although the trial court determined that the Tariff was applicable to Marriott's negligence claim, it made no determination as to whether it

erred. This time, we are not persuaded.

Gross negligence is

"An intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."

*Romanesk v. Rose,* 248 Md. 420, 423, 237 A.2d 12 (1968) (quoting 4 DeWitt C. Blashfield, *Cyclopedia of Automobile Law and Practice* § 2771 (1946 ed.)). *See also Liscombe v. Potomac Edison Co.,* 303 Md. 619, 634–37, 495 A.2d 838 (1985). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Artis v. Cyphers,* 100 Md.App. 633, 652, 642 A.2d 298 (whether ambulance driver's conduct amounted to gross negligence was issue for trier of fact to determine), *aff'd,* 336 Md. 561, 649 A.2d 838 (1994). *See also Romanesk,* 248 Md. at 424–25, 237 A.2d 12 (whether operation of motor vehicle under existing conditions was grossly negligent was question for jury). *Compare Boucher v. Riner,* 68 Md.App. 539, 547–48, 514 A.2d 485 (1986) (trial court properly granted summary judgment in favor of defendant skydiving instructor where undisputed facts failed to suggest wanton or reckless disregard for plaintiff's life).

Marriott's complaint explained that the fiber optic cable was severed by a road crew performing excavations for the installation of signs. It then stated simply: "The negli-

---

was also applicable to the gross negligence claim. In light of our conclusion that the court erred in determining on summary judgment that Marriott was C & P's customer and that the Tariff was applicable, and because, as we shall explain, the facts before the court did not support the claim for gross negligence, we shall not address the matter further.

gence and breach of duty of care by Chesapeake & Potomac was wanton, willful and/or reckless, which conduct constituted gross negligence." [9] In support of this allegation, and in opposition to C & P's motion for summary judgment on the gross negligence count, Marriott pointed below to the deposition testimony of Robert Carwithen and another C & P locator, Frank Keyser.

Carwithen testified that, before marking the location of the cable in question, he reviewed phone company plats regarding the cable's placement. He then went to the scene and located the cable using a device called a dynatel. Carwithen explained that a dynatel uses "like a radio frequency that transmits down to any metal, it will pick up metal or whatever . . . ." The device consists of a transmitter and a wand. The transmitter is placed over a manhole cover, under which part of the cable is located. The wand is then used to locate the cable as it extends outward from the manhole cover. According to Carwithen, "[i]t makes a loud noise, and when you get over the cable it goes down to where you can't hardly hear it, and then picks back up so you know you're over a cable." Carwithen painted a single, dashed line over the center of the cable in the areas where SHA intended to place signs. He painted the message "OK" at the SHA stake where the cable was ultimately severed, because the stake was 45 to 50 inches from his painted line. Carwithen explained that he believed the stake was "far enough away from my marks where it was no problem with them putting the sign at that location." Carwithen testified that he was taught how to locate cables by other C & P locators. He added that he had never been provided with any written instructions.

---

**9.** As an incidental matter, we note that the skeletal allegations in the complaint may well have been insufficient to have survived a motion to dismiss for failure to state a claim upon which relief can be granted had such a motion been filed. "In order to charge . . . gross negligence, the plaintiffs must [plead] *facts* showing that [the defendant] acted with a wanton and reckless disregard for others. . . ." *Boyer v. State*, 323 Md. 558, 579, 594 A.2d 121 (1991) (emphasis in original).

Frank Keyser, a C & P employee for 24 years, testified that he sometimes worked as a cable locator when the full-time locators "had too much work to do." Keyser stated that the most accurate way to use the dynatel was to open the manhole cover and place a clamp on the specific cable to be located. He explained that the device also works if you simply place the transmitter on a manhole cover, as did Carwithen, but that you run the risk of picking up cables from other utilities. Keyser testified that, prior to the incident in question, another cable locator had mismarked a cable and the cable had been severed. He explained that ever since then C & P locators have marked both sides of the cable rather than just the middle. Keyser stated that he believed C & P had written guidelines that explained how cables were to be marked.

Marriott contends that, based on this, a trier of fact could determine either that Carwithen was grossly negligent in locating the cable or that C & P was grossly negligent in training and supervising Carwithen. We are convinced, however, that although the evidence might support a negligence finding, it could not support a finding of gross negligence. Carwithen demonstrated a thorough understanding of the proper operation of the dynatel device. While Keyser indicated that the device works more accurately if clamped directly to the cable rather than simply placed over the manhole cover, the risk from the latter method consisted only of detecting another company's cable, not of failing to detect one's own cable. Although Keyser stated that the "newer practice" was to mark both sides of the cable rather than the middle, nothing suggests that Carwithen's failure to mark both sides amounted to "[a]n intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another . . . ." *Romanesk,* 248 Md. at 423, 237 A.2d 12. Indeed, Carwithen explained in his deposition that he had consulted C & P's plats before attempting to locate the cable and had used the dynatel device to find the exact location of the cable. Based on this, he had determined that the SHA stake was a sufficient distant from the cable as measured. Thus, uncontroverted evidence indicated that Car-

withen did exert some effort to avoid a severance of the cable. *See id.* The trial court properly granted C & P's motion for summary judgment as to the gross negligence count.

SUMMARY JUDGMENT IN FAVOR OF APPELLEE REVERSED AS TO COUNT I (NEGLIGENCE) AND AFFIRMED AS TO COUNT II (GROSS NEGLIGENCE); CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID 1/2 BY APPELLANT AND 1/2 BY APPELLEE.